Ruth V. McGregor, AZ Bar No. 003820
7601 North Central Avenue, Unit 23
Phoenix, Arizona 85020
(602) 370-4029
mcgregorspecialmaster@gmail.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| J.K., a minor by and through R.K., et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WILL HUMBLE, in his official capacity as Interim Director of the Arizona Department of Health Services; DR. LAURA NELSON, in her official capacity as Director, Division of Behavioral Health Services; THOMAS J. BETLACH, in his official capacity as Director, Arizona Health Care Cost Containment System<br><br>Defendants. | No. CV-91-261 TUC-AWT<br><br>**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS** |

On November 15, 2012, Judge A. Wallace Tashima appointed the undersigned as Special Master in this matter. The appointment followed several attempts by the parties to agree upon the proper interpretation of the parties' 2001 Settlement Agreement (the Agreement or SA) and to define those issues remaining for resolution by the Court. Judge Tashima directed that, within six months of appointment, I should issue a report

and recommendations "concerning the interpretation of the Settlement Agreement and whether and, if so, how to proceed in resolving any disputes arising under the Agreement." Dkt. 586.

After meeting informally with the parties and their attorneys, the special master directed that the parties submit written memoranda analyzing the issues in dispute. As to each issue, the parties were to "define those provisions in the Agreement that affect the issue; what the parties intended in adopting the relevant provisions; what relevant extrinsic evidence can be considered in determining the intent of the parties; and what standard the Court should apply to measure compliance with the relevant provision." Dkt. 589, December 20, 2012. The parties filed their respective memoranda on January 24, 2013, [Dkt. 592 and 594] and their responses on February 4, 2013. Dkt. 595, 596.

The special master heard oral argument on February 21, 2013. Dkt. 598; TR at Dkt. 603. The parties filed post-hearing memoranda on March 4, 2013. Dkt. 601, 602. The special master provided a draft copy of this Report to the parties on April 24, 2013, and allowed them to file objections and recommendations on or before May 6, 2013. After considering those objections, in conjunction with previously-filed documents and argument, I submit this Report and Recommendations.[1]

**Background**

The current dispute arises out of the Settlement Agreement entered between the parties in 2001 and extended in 2006.[2] In 2009, plaintiffs invoked the dispute resolution provisions of Section IX of the Agreement by sending a letter to defendants. In their letter of March 6, 2009 (the March 2009 letter),[3] plaintiffs listed six "serious" issues in dispute. Although the parties disagree as to the scope of the issues defined by plaintiffs and the analysis required to resolve these issues, they have reached agreement in several

---

[1] All materials considered by the special master are part of the record; no materials were filed under seal.

[2] The Settlement Agreement appears in the record in several locations. It appears in electronic format at Dkt. 592, Ex. A.

[3] The March 2009 letter appears in electronic format at Dkt. 491, Ex. 11.

- 2 -

areas.

First, the parties agree that the Court retains jurisdiction to resolve the issues plaintiffs raised in the March 2009 letter and that their current dispute is limited to those matters raised in the letter. They also agree that the Agreement should be interpreted as a contract and that the laws of Arizona govern its interpretation.

The parties also do not dispute the basic rules that apply to contract interpretation in Arizona. They agree that the party alleging a breach bears the burden of proving the breach. They also agree that a court's objective in interpreting a contract is to arrive at the intent of the parties as expressed in the contract and that the court should give words their ordinary meaning; read the contract as a whole, giving effect to the main purpose of the instrument; and interpret the contract so as to make it effective and reasonable. *E.g., Phelps Dodge Corp. v. Brown*, 112 Ariz. 179, 181, 540 P.2d 651, 653 (1975).

Several other aspects of Arizona law affect the resolution of these disputes. First, Arizona has adopted the general principles of the *Restatement (Second) of Contracts* (1979) to guide judicial interpretation of contracts. *See Gordinier v. Aetna Casualty & Surety Co.,* 154 Ariz. 266, 742 P.2d 277 (1987). In addition, Arizona law "implies a covenant of good faith and fair dealing in every contract." *Rawlings v. Apodaca*, 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986). "Such implied terms are as much a part of the contract as are the express terms." *Wells Fargo Bank v. Arizona Laborers, Pension Trust Fund*, 201 Ariz. 474, 490, 38 P.3d 12, 28 (2002).

**Measure of Compliance**

Although the parties agree as to the basic rules governing contract interpretation in Arizona, they disagree about the test to apply to determine whether defendants have breached any contractual obligation. Plaintiffs assert that the test is whether defendants have substantially complied with the terms of the Agreement. Defendants, who initially argued that the substantial compliance test applies, now assert that, because many of the terms of the Agreement created qualitative obligations to which no objective performance standards apply and left implementation in many areas to the defendants' discretion, their performance should be measured under a standard of good faith. Given the terms and

structure of the Agreement, both parties' arguments find support in the law of Arizona and, in application, are not inconsistent.

Plaintiffs correctly assert that Arizona measures alleged breaches of contract under the doctrine of substantial compliance. *Matson v. Bradbury*, 40 Ariz. 140, 144, 10 P.2d 376, 378 (1932). To determine questions of substantial compliance, a court generally considers the promised performance, the purpose of the contract, and the extent to which any defects in performance have frustrated the purpose of the contract. *See Foundation Development Corp. v. Loehman's, Inc.*, 163 Ariz. 438, 446-47, 788 P.2d 1189, 1197-98 (1990) (citing *Restatement (Second) of Contracts* § 241).

Although the doctrine of substantial compliance applies to all alleged breaches of contract, precisely what constitutes substantial compliance must be measured according to the nature of the promised performance. The doctrine provides a relatively easy test to apply when a contract defines a quantitative standard to use in measuring a party's promised performance. The substantial compliance test is more difficult to apply when, as in this case, some terms of an agreement create qualitative obligations for which the parties have defined no objective standards of performance.

Defendants correctly point out that the language of the Agreement defines many of defendants' obligations, including "core obligations," in qualitative terms and provides no objective standard by which to measure performance. By way of example, the Agreement describes the parties' intent as being to "substantially improve the system for delivery of behavioral health services," SA.I.1, states that defendants "agree to foster the development" of a system that "delivers services according to [the Agreement's] Principles," SA.III.14, and requires that defendants "move as quickly as practicable" to develop the system, SA.III.15. In these and other instances, the Agreement affords the defendants discretion in how to implement qualitative obligations. In contrast, other terms of the contract, particularly those in Section VI, define more specific steps that defendants must take, some of which apply objective standards and some of which define defendants' obligations in qualitative terms, as discussed below.

Whether a contract defines contractual obligations in qualitative or quantitative

- 4 -

terms, however, the first task in resolving questions of substantial compliance is to define the nature of the promised performance. When a party's promised performance relates to a qualitative term of a contract that affords the party discretion in performance, the analysis of whether the party has breached that contractual term typically turns on whether the party has breached the covenant of good faith and fair dealing. *See, e.g., Labor/Community Strategy Center v. LA County Metropolitan Transp. Auth.*, 564 F.3d 1115 (9th Cir. 2009); *Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 424, 46 P.3d 431, 435 (App. 2002).

The reason for applying a good faith analysis in such instances seems clear. Unless some standard limits a party's exercise of discretion in performing qualitative terms of a contract, an allegedly breaching party could assert that any activity fell within the ambit of his discretionary duties and thus fulfilled the promised performance. Because that approach could result in enforcing an outcome inconsistent with the intention of the parties, most courts, including those of Arizona, regard the covenant of good faith and fair dealing as an implied term of every contract. "The duty to perform in good faith applies when one party exercises discretion in performance and thereby controls the other party's anticipated benefit. The good faith performance doctrine may be said to permit the exercise of discretion for any purpose—including ordinary business purposes—reasonably within the contemplation of the parties. A contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming a breach." Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 385-86 (1980). Even discretionary duties, therefore, must be performed in a manner that does not defeat the parties' purpose in entering the contract and in a manner consistent with a party's justified expectations. *Wells Fargo Bank*, 201 Ariz. at 492, 38 P.3d at 30.

Although plaintiffs here did not allege that defendants breached the covenant of good faith and fair dealing, plaintiffs' claims, for the most part, must rely on that implied covenant. Under the express terms of the Agreement, defendants' obligations are, in

- 5 -

many instances, defined only by subjective standards that afford the defendants considerable discretion. Absent application of the covenant, defendants could assert that any exercise of discretion satisfied their obligations. Under Arizona law, however, defendants could exercise the discretion afforded by the contract only in a manner consistent with the purpose of the Agreement and in a manner consistent with plaintiffs' reasonably expected benefits.

### Issues Set Out in Plaintiffs' March 6, 2009 Letter

Although the parties agree that the disputes over which the Court retains jurisdiction are those set out in the March 2009 letter, they disagree over the scope of the disputes as defined in the letter. At the hearing before Judge Roll on November 22, 2010, plaintiffs acknowledged that they were bound by the parameters of the issues they raised in the letter.[4] Dkt. 535 at 17. On later occasions, however, plaintiffs have suggested that the scope of the dispute before the Court is considerably broader than those specific issues set out in their letter. *E.g.*, Dkt. 594, 14-16. The Court must determine, then, whether plaintiffs can argue matters not expressly raised in the March 2009 letter.

Section IX of the Agreement, which describes the dispute resolution process available under the Agreement, defines a sequential process that begins when a party submits to all other parties "a written statement of the issue in dispute." SA.IX.A.59. Given the detail with which the parties describe the dispute resolution process and the express requirement that a party begin the process by providing a written statement of the issue[s] in dispute, the most reasonable interpretation of the provision is that the parties intended to define and limit the issues in dispute, an outcome that is possible only if disputed issues are defined with some specificity. I therefore conclude that the issues in dispute are limited to those six issues specifically identified as serious remaining issues

---

[4] At the hearing, Judge Roll reminded the parties of his earlier concerns related to the lack of specificity in the Agreement: "Again I recall back many years ago when this was discussed, and it's my recollection I expressed some concern about the lack of precision as far as exactly what was contemplated by the agreement, and I was assured that it would come together and that details would be worked out, but obviously, after all these years, they have not been worked out." Dkt. 535 at 12. As these proceedings demonstrate, Judge Roll accurately predicted the parties' difficulty in applying the imprecise terms of the Agreement.

on page 3 of the March 2009 letter.

Plaintiffs object to this recommendation, arguing that portions of the March 9 letter that precede the listing of specific issues should be included as part of the allegations at issue. That argument appears inconsistent with plaintiffs' own approach to the nature of the letter. First, plaintiffs use the introductory portions of the letter as a general explanation of why the six "serious issues" remain. Second, plaintiffs agreed, both before Judge Roll and the special master, that the disputes remaining are those six issues set out in the March 2009 letter. Although plaintiffs' statements recognizing the limits of the disputes at issue certainly do not constitute admissions, they are helpful in determining what plaintiffs intended to accomplish in their letter.

As to each of the six serious issues defined by plaintiffs, I make the following recommendations.

**Issue 1**

Issue 1 in plaintiffs' March 9 letter includes two distinct allegations. First, plaintiffs allege that defendants "failed to meet their core obligation under the Settlement Agreement to develop (at first by July 2007, but now by July 2010); a Title XIX behavioral health system that delivers services according to the *J.K.* Principles." Second, plaintiffs allege that defendants "have not made changes to 'contracts, decisions, practice guidelines and other policies' needed to achieve the Principles for class members."[5]

Although plaintiffs' March 2009 letter does not identify the specific provisions of the Agreement that defendants allegedly breached, their first allegation relies initially upon Section III.14 of the Agreement, which states that defendants "agree to foster the development of a Title XIX behavioral health system" that delivers services according to the Principles defined in Section V of the Agreement. The plaintiffs also point to paragraphs 15 and 16 in Section III, which require, respectively, that defendants "move as quickly as practicable to develop" a system that delivers services in accord with the

---

[5] Plaintiffs end by stating, "Major failings are described below," apparently referring to the five more specific issues that follow.

- 7 -

Principles and that defendants conform "all contracts, decisions, practice guidelines and policies" to be consistent with and designed to achieve the Principles.

The parties' disagreement as to the scope of defendants' obligations under paragraphs 14 through 16 of the Agreement is at the heart of their dispute. Defendants argue that paragraph 14 requires only that they "foster," or encourage, the development of the described system and that nothing in the Agreement requires them to "develop" or ensure any particular system. Plaintiffs assert that paragraph 15, which requires that defendants move as quickly as practicable "to develop" a system and maintain that system for "the term of this Agreement" essentially expands the scope of defendants' obligations under paragraph 14. These two interpretations of the Agreement cannot be reconciled; one must be selected as the more reasonable interpretation of the parties' intent at the time of the Agreement.

The first task in interpreting these basic provisions of the contract is to define the promised performance: Did defendants agreed to "develop" the described system or, more modestly, to "foster" the development of such a system? I conclude that the express language of paragraph 14, which requires defendants to "foster" the system, discloses the parties' intent. Several other factors favor that interpretation. First, paragraphs 15 and 16, as structured and placed in the Agreement, add to but do not redefine the initial, basic requirement of paragraph 14. Second, other portions of the Agreement indicate that the parties understood that the defendants would foster, not assure, development of the system. The Recitals, in Section I.1, state that the parties intend to "substantially improve" the delivery of services and that implementing the Agreement will require "initiatives to *improve* front-line practice, *enhance* the capacity of private agencies to deliver needed services, *promote* collaboration among public agencies, and develop a quality management and improvement system *focused* on sound practice." (Emphases added.) All these general terms are consistent with an intent to foster development of an improved system rather than an intent to require development of a specific system.

If the language of the Agreement were not sufficiently clear to discern the parties'

- 8 -

intent, external evidence of the circumstances surrounding the settlement negotiations provides strong support for defendants' argument.[6] In November 2000, plaintiffs submitted a draft Settlement Agreement that stated in part: "Defendants shall a) *ensure that by July 1, 2006*, behavioral health services are provided to class members in conformity with the 'principles' in Section V below." Dkt. 592, Ex. B, II(a) (emphasis added). But the Agreement as adopted describes defendants' obligation as being to "foster," rather than "ensure," development of a Title XIX behavioral health system that delivers services according to the Principles. Dkt. 592, Ex. A,III.14. In addition, while plaintiffs' draft document included a date certain for performance, the Agreement as adopted requires that defendants "move as quickly as practicable" to develop the described system. *Id*. 15.[7]

Plaintiffs' allegation in Issue 1 of the March 2009 letter that defendants have failed to develop a particular system by July 2012, returns to the language of the proposed, but rejected, draft settlement agreement. The final Agreement simply does not require either that defendants "develop" a desired system or that they do so by a date certain. By asserting that defendants failed to meet their core obligation to develop a system that delivers services by a defined date, plaintiffs have moved beyond the language of the contract and now seek to impose obligations not a part of the Agreement. While the allegation may describe plaintiffs' intent in bringing the underlying action, it does not describe the parties' intent as reflected in the language of the Agreement.

I recommend that the Court find, as a matter of law, that the Agreement does not

---

[6] Section 212(1), *Restatement (Second) of Contracts*, on which Arizona relies, points out that the interpretation of an integrated contract "is directed to the meaning of the terms of the writing or writings in the light of the circumstances, in accordance with the rules stated in this Chapter." Comment b further explains that the rule of subsection (1) should not be limited to cases in which the language used is ambiguous, as any determination of meaning or ambiguity should be made only in light of the relevant evidence of the situation and the relations of the parties.

[7] Plaintiffs point to memoranda and letters prepared by plaintiffs during the years after execution of the Agreement to support their argument that the Agreement requires defendants to develop, rather than to foster the development of, a specific system. Documents not directly related to the parties' intent at the time of an agreement provide little relevant information as to intent at the time of execution of a document.

- 9 -

obligate defendants to develop a behavioral health system that delivers services according to the *J.K.* principles by a time certain.

Plaintiffs object to this recommendation, arguing that, while the letter may have been inartfully drafted, plaintiffs previously had put defendants on notice that they were required to move as quickly as practicable to develop a system that complied with the Principles. Therefore, plaintiffs conclude, this statement in Issue 1 should be regarded as alleging not that defendants failed to develop a system by a time certain but rather as stating that defendants did not move as quickly as practicable, as required by paragraph 15 of the Agreement.

In my view, plaintiffs seek more than an alternate interpretation of an inartfully-described "serious issue." Plaintiffs chose the language to define their dispute with defendants and chose very specific language. Asserting that defendants failed to develop a system by a date certain is different in kind than asserting that defendants failed to move as quickly as practicable to foster the development of a system. The nature of defendants' required performance differs substantially under the two assertions. While plaintiffs could have defined the issues in dispute differently, they did not. This assertion, as described, does not allege a violation of any obligation imposed by the Agreement.

The second allegation of Issue 1 does involve an obligation imposed on defendants by the Agreement. Drawing on language taken directly from Section III.16 of the Agreement, plaintiffs charge that defendants "have not made changes to 'contracts, decisions, practice guidelines and other policies' needed to achieve the Principles for class members." Paragraph 16 defines defendants' obligation in broad, general terms, includes no objective standards by which to measure compliance with this obligation, and allows defendants to exercise discretion in conforming the documents and policies to be "consistent with and designed to achieve" the Principles. Under these circumstances, defendants' performance should be measured against their obligation to comply with the covenant of good faith and fair dealing. To establish this allegation, plaintiffs must show that defendants exercised their discretion to make changes needed to achieve the

Principles in a manner not consistent with the covenant of good faith and fair dealing.

**Issue 2**

In Issue 2, plaintiffs charge that defendants failed to design a quality management system (QM system) that measures whether services "are designed and implemented to achieve the *J.K.* functional outcomes" and "generate[s] information on whether services are provided in the most integrated setting, or on the sufficiency of interagency collaboration."  In addition, plaintiffs allege, defendants have not developed adequate systems to review individual cases.  These requirements, plaintiffs assert, form a critical part of the remedy provided under the terms of the Agreement.

This disputed issue arises from obligations imposed on defendants by Sections III.17(i) and VIII.55 of the Agreement.  Paragraph 55, the most specific, requires that defendants "change their quality management and improvement system *so that it measures* whether services to class members are consistent with and designed to achieve the Principles . . . ."  (Emphasis added.)  Defendants assert that the parties intended to give defendants flexibility in adopting changes to the QM system, rather than to be prescriptive.

I conclude that plaintiffs have defined a dispute that raises factual issues as to whether defendants performed their obligations.  Defendants correctly assert that the language of the contract clearly affords defendants discretion in developing and implementing a QM system.  It is also clear, however, that defendants promised to change their QM system so that it performs the required measurements.  The system, as developed and implemented by defendants, either measures whether services provided are consistent with and designed to achieve the Principles, or it does not.  The measurement process either did include an in-depth review of a sample of individual cases, or it did not.  The Agreement does not give plaintiffs authority to design or select defendants' QM system, but the Agreement does define measurable standards for evaluating defendants' performance.  If the plaintiffs establish that defendants' QM system does not fulfill the requirements of paragraph 55, then defendants have breached this obligation.

- 11 -

### Issue 3

Plaintiffs' basic allegation in Issue 3 is that defendants failed to develop a functioning QM system that identifies enrolled children with high needs. In addition, plaintiffs assert, defendants failed to expand services to this group by failing to reallocate money from costly residential care and that defendants have hired too few case managers for high-needs children. Defendants respond that the Agreement exacts no promise that they will develop the services sought or expand the number of case managers for high-needs children.

As defendants argue, the Agreement does not obligate defendants to develop the specific services now sought by plaintiffs, and plaintiffs cannot establish a breach of contract for failing to provide services not required by the Agreement. These allegations, however, do relate to the challenges plaintiffs raised to the QM system as developed by defendants. High-needs children are part of the class certified by the Court, and any promised performance that relates to the entire class also applies to these plaintiffs. For that reason, plaintiffs' allegation that defendants failed to develop a functioning QM system that measures whether services for high-needs children are consistent with and designed to achieve the Principles falls within the allegations of Issue 2. Factual questions related to defendants' promise to develop a QM system that measures whether services for high-needs children are consistent with the Principles, particularly those described in Section V, paragraphs 21, 23, 25 and 27, can be developed as part of the inquiry under Issue 2.

### Issue 4

Plaintiffs assert, as their basis for Issue 4, that defendants provide inadequate services to address substance abuse among high-needs children. Defendants respond that their obligations with regard to substance abuse are clearly defined in Section VI.H.52. As defendants correctly note, paragraph 52, the only contractual provision that addresses substance abuse treatment services, requires that defendants "develop a plan for the expansion of substance abuse treatment services as part of its first Annual Action Plan." Plaintiffs do not dispute that defendants completed the performance promised under

paragraph 52. Defendants have fulfilled their contractual obligations related to substance abuse services; no additional issues remain for the Court's consideration.

**Issue 5**

Issue 5 rests upon the premise that defendants have made little change in the treatment of 18- to 21-year-olds in the behavioral health system. As defendants correctly respond, no promised performance or time table applies to this group. Defendants have breached no obligation undertaken as to these patients, when identified as a separate group. As is true of the high-needs children to whom plaintiffs referred in Issue 3, however, defendants owe these children, as part of the class, any obligations owed to the entire class. Questions related to defendants' promise to develop a QM system that measures whether services for these children are consistent with the Principles can be raised as part of the inquiry under Issue 2.

**Issue 6**

The final issue raised in the March 2009 letter involves defendants' alleged failure to develop a training program that meets the specifications of the Agreement. Specifically, plaintiffs allege, "there are not qualified trainers in sufficient numbers, and the program fails to impart sufficient knowledge and skills to enable staff to provide services according to the Principles." Defendants respond that, because the contractual provisions related to the training program do not require specific numbers of trainers but, rather, afford defendants discretion in carrying out this obligation, defendants fulfilled their obligations if they hired trainers in a number they deemed sufficient.

In Section VI of the Agreement, titled "Specific Steps," the parties adopted several specific provisions that describe the promised training program in some detail. *See* SA, VI.A.32-39. With regard to the specific allegations made by plaintiffs, paragraph 39 defines defendants' promised performance as follows: "The behavioral health system *will have qualified trainers in sufficient numbers* to train front-line staff and supervisors." (Emphasis added.) Paragraph 35 directs defendants to design a training program "to provide front-line staff and supervisors sufficient knowledge and skills to enable them to plan and provide services consistent with the Principles." As defendants point out, the

Agreement includes no quantitative measurements related to training and vests discretion in defendants. The covenant of good faith and fair dealing, however, requires that defendants provide trainers and training in sufficient quantity to fall within the reasonable contemplation of the parties. Whether the plan developed by defendants fulfills the covenant of good faith and fair dealing raises factual issues for the Court's consideration.

**Recommendations**

Based upon the foregoing analysis, I recommend that the Court proceed as follows:

1. The Court should limit the disputes before the Court for resolution to those six issues expressly raised in plaintiffs' March 2009 letter. The result of doing so will be to reject those arguments by plaintiffs that depend upon the general introductory language of the letter and those arguments that rely upon allegations of the Complaint rather than upon terms of the Settlement Agreement.

2. The Court should interpret the Settlement Agreement as a contract, applying the local law of Arizona, including Arizona's reliance upon the *Restatement (Second) of Contracts* and Arizona's interpretation of all contracts as including an implied covenant of good faith and fair dealing.

3. Arizona requires that, to establish a breach of contract, a party must establish that the breaching party failed to substantially comply with the terms of the contract, which requires a showing that the party failed to deliver the promised performance and that the defect in performance frustrated the purpose of the contract.

4. Several of plaintiffs' allegations involve obligations described in qualitative terms, which provide no objective standard by which to judge performance and which afford defendants discretion in carrying

out their obligations. Those allegations should be considered as alleging a breach of the implied covenant of good faith and fair dealing.

5. I recommend that the Court hold that plaintiff's first allegation in Issue 1 of the March 2009 letter does not raise a dispute cognizable under the Settlement Agreement, as the Agreement does not obligate defendants to develop a system that delivers prescribed services by a date certain.

6. Plaintiffs' second allegation in Issue 1, that defendants failed to make the changes to "all contracts, decisions, practice guidelines and other policies" needed to achieve the Principles, raises factual issues that must be resolved to determine whether defendants breached the implied covenant of good faith and fair dealing.

7. In Issue 2, plaintiffs allege that defendants failed to develop a quality management assurance system that performs certain required measurements. Paragraph 55 of the Agreement defines measurable standards for evaluating defendants' performance; these allegations require factual development.

8. In Issue 3, plaintiffs allege that defendants' quality assurance system does not measure whether services provided for high-needs children are provided consistent with and to further the Principles. This allegation is part of the argument related to Issue 2 and should be considered in conjunction with that issue.

9. I recommend that the Court hold as a matter of law that defendants have complied with the contractual obligations related to substance abuse treatment, as defined by Paragraph 52 of the Agreement and that no dispute remains as to Issue 4.

10. In Issue 5, plaintiffs allege that defendants' quality assurance program does not measure whether services for 18- to 21-year-old children are being provided in a manner consistent with and to further the Principles.  This allegation is part of the argument related to Issue 2 and should be considered in conjunction with that issue.

11. Issue 6 requires the Court to determine whether defendants have complied with the obligations described in paragraphs 32 through 39, which require development of a training program that provides staff and supervisors sufficient knowledge and skills and sufficient trainers to provide services consistent with the Principles.  These allegations require factual development.

DATED this 17th day of May, 2013.

_____
Ruth V. McGregor
Special Master