ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST
Anne C. Ronan  (006041)
202 E. McDowell Road, Suite 153
Phoenix, Arizona 85004
Telephone:  (602) 258-8850
Facsimile:  (602) 258-8757

BAZELON CENTER FOR MENTAL HEALTH LAW
Ira A. Burnim
Julia Graff
Emily B. Read
1101 Fifteenth Street N.W. Suite 1212
Washington D.C.  20005-5002
Telephone:  (202) 467 5730
Facsimile:  (202) 233 0409

YOUNG MINDS ADVOCACY PROJECT
Patrick Gardner
115 Haight Street
Menlo Park, CA 94025
Telephone:  (650) 678-0606

ARIZONA CENTER FOR DISABILITY LAW
Edward L. Myers III (0018856)
5025 E. Washington Street, Suite 202
Phoenix, AZ  85034
Telephone: (602) 274-6287
Facsimile:  (602) 274-6779

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| J.K., a minor by and through R.K., *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WILL HUMBLE, in his official capacity as Interim Director of the Arizona Department of Health Services; COREY NELSON, in his official capacity as Director, Division of Behavioral Health Services, Arizona, Department of Health Services; THOMAS J. BETLACH, in his official capacity as Director, Arizona Health Care Cost Containment System,<br><br>Defendants. | No. CIV 91-261 TUC-AWT<br><br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' THREE MOTIONS IN LIMINE (RE:  ISSUES IN DISPUTE, MEDICAID, AND EXPERT WITNESSES)**<br><br><br>(Honorable A. Wallace Tashima) |

Plaintiffs submit this memorandum in response to Defendants' three motions in limine.  (Docs. 641-643).  The first seeks to preclude Plaintiffs from introducing evidence or argument that Defendants failed "to comply with provisions of the Agreement other than their obligations as to quality management, training, and document modification," "failed to meet their service obligations to 18-21 year olds or 'high needs' children," failed to meet "any deadline, "or failed to meet their obligations as to substance abuse services."  (Doc. 641 at 5).   As Plaintiffs will show below, Defendants' motion grossly misstates the Special Master's Report and Recommendation at 1 ("Special Master's Report" or "Report") (Doc. 607).  Plaintiffs concur that the Special Master found that Paragraph 15 of the Settlement Agreement ("Agreement") did not require Defendants to fully develop by the end of the term of the Agreement a behavioral health system that delivers services according to the Principles.  *Id*. at 9-10.  In addition, the Special Master found that Defendants had fulfilled their obligations with respect to Paragraph 52 of the Agreement regarding the development of a plan for substance abuse services.  *Id*. at 12-13.  But the Special Master also made clear that Defendants' obligations were far greater than "quality management, training, and document modification."  She found that Plaintiffs had raised a valid claim of noncompliance with respect to Paragraph 16 of the Agreement, which Defendants unfathomably characterize in their motion as being limited to "document modification."  Paragraph 16 requires Defendants to "conform all contracts, *decisions*, practice guidelines and *policies* related to the delivery of Title  XIX[1]

_____

[1] "Title XIX" refers to the Medicaid Act.

behavioral health services to be consistent with and designed to achieve the Principles."[2]
Agreement at ¶ 16 (emphasis added).  The Report stated that "plaintiffs charge that
defendants 'have not made changes to contracts, decisions, practice guidelines and other
policies needed to achieve the Principles for class members,'" which created an issue for
trial.  Report at 10, 15 at ¶ 6.  Moreover, the Special Master found that evidence regarding
18- to 21-yearolds and high-needs children was relevant to Plaintiffs' valid claim of
noncompliance with Paragraph 16.  As the Special Master noted, "High-needs children are
part of the class certified by the Court, and any promised performance that relates to the
entire class also applies to these plaintiffs."  *Id*. at 12.  With respect to 18- to 21-year-olds,
she also found, "[a]s is true of the high-needs children . . . , defendants owe these children,
as part of the class, any obligations owed to the entire class."  *Id*. at 13.

Defendants' second motion in limine seeks to preclude evidence or argument that
Defendants have breached the Agreement by not complying with Medicaid requirements
or by not providing services that are medically necessary or that "meet the needs" of the
Plaintiffs.  (Doc. 642 at 6).  Plaintiffs have always taken the position that their claim of
noncompliance is based on the Agreement and not directly on the Medicaid statute, but as
shown below, the requirements of Medicaid law are relevant to whether Defendants have
"made changes to contracts, decisions, practice guidelines and other policies needed to
achieve the Principles for class members," an issue for trial according to the Special

---

[2] (emphasis added).  The full text of  ¶ 16 is: "As quickly as practicable, Defendants will
conform all contracts, decisions, practice guidelines and policies related to the delivery of
Title XIX behavioral health services to be consistent with and designed to achieve the
Principles."

Master.  Report at 10, 15 at ¶ 6 (Doc. 607).  Moreover, it is impossible to discuss the topic of whether Defendants did what was needed "to achieve the Principles for class members," *id*., without making reference to the "needs" of the Plaintiff class.  The Principles themselves are rife with references to children's needs[3] and, as the evidence will show, the very purpose of the Principles was to transform the behavioral health system so that it met children's needs.  *See, e.g.*, ADHS Press Release at 2 (Mar. 20, 2001), Exhibit F (Doc. 393) (Agreement requires a "fundamental shift in the way [the state] treats children and families").  Like Paragraph 16, the obligations in the Agreement

---

[3]  For example:

> ¶ 23:  *Accessible services*:  Children have access to a comprehensive array of behavioral health services, sufficient to ensure that they *receive the treatment they need*.  Case management is provided *as needed*.  Behavioral health service plans identify transportation the child and parents *need* to access behavioral health services, and how transportation assistance will be provided.  Behavioral health services are adapted or *created when they are needed* but not available.

> ¶ 25:  *Most appropriate setting*:  Children are provided behavioral health services in their home and community to the extent possible.  Behavioral health services are provided in the most integrated setting *appropriate to the child's needs*. …

> ¶ 27:  *Services tailored to the child and family*:  The unique strengths and *needs of children* and their families dictate the type, mix, and intensity of the behavioral health services provided.  Parents and children are encouraged and assisted to articulate … what services they think are *required to meet those need*.

regarding quality management (¶ 55) and training (¶¶ 32-39) are designed to and explicitly reference achieving the Principles for class members,[4] which necessarily includes Principles related to identifying and meeting children's needs.[5]

Defendants' third motion in limine seeks to preclude expert testimony for failure to comply with the Court's directive concerning disclosure of expert witnesses. As shown below, Plaintiffs followed the Court's directive in the way it was interpreted by both Plaintiffs and Defendants (as applying to retained experts), and Plaintiffs made the same disclosures that Defendants did. Moreover, Defendants never sought to compel Plaintiffs to make the disclosures they now assert were required.

## I. BACKGROUND

Plaintiffs, Medicaid-eligible children with emotional and behavioral disorders, filed this class action lawsuit in 1991. *See* Complaint, May 8, 1991 (Doc. 1). Plaintiffs sought

---

[4] Echoing ¶ 16, the Agreement's obligations regarding quality management include:

> ¶ 55    Defendants shall change their quality management and improvement system so that it measures whether services to class members *are consistent with and designed to achieve the Principles…*.

(emphasis added), and the Agreement's obligations regarding training include:

> ¶ 35    The training program will be designed to provide front-line staff and supervisors sufficient knowledge and skills to enable them to plan and provide services *consistent with the Principles*.

(emphasis added).

[5] Plaintiffs believe that Defendants' witnesses will affirm that the purpose of the Principles is to aid and guide the behavioral health system in identifying and meeting children's needs.

to compel Defendants to provide them with medically necessary mental health and

substance abuse services ("behavioral health services") in compliance with the Medicaid

Act, 42 U.S.C. § 1396d(r), *et seq*. *See* Second Amended Complaint, April 26, 1993 (Doc.

85).  The certified class includes "all persons, under the age of twenty-one, who are

eligible for Title XIX behavioral health services in the State of Arizona and have been

identified as needing behavioral health services."  Order, June 24, 1993, at 7-8 (Doc. 119).

Ten years later, this Court approved a judicially enforceable Settlement Agreement

to protect the right of Arizona's Medicaid-eligible children to receive medically necessary

behavioral health services.  In doing so, the Court specifically "adopted" the Agreement

"in its entirety."  Order, June 26, 2001 (Doc. 397).  The Agreement, by its terms, is

"legally binding and enforceable by the Court."  Agreement at 1 (Doc. 395).

Federal law requires States to provide Medicaid-eligible children "necessary . . .

services, treatment and other measures . . . to correct or ameliorate . . . physical and

mental illnesses and conditions." 42 U.S.C. § 1396(d)(a)(4)(B);[6] *Katie A. v. Los Angeles*

*County*, 481 F.3d 1150, 1154 (9th Cir. 2007).  In the Agreement, Defendants—the

directors of the Arizona Department of Health Services, the Department's Division of

Behavioral Health Services, and the Arizona Health Care Cost Containment System—

committed to meet this obligation by developing a service system that meets the

---

[6] The cited statute is commonly referred to as the "EPSDT" program of Medicaid.  It requires
States to deliver "early and periodic screening, diagnostic, and treatment services," known
as "EPSDT" services, to Medicaid-eligible children and youth under 21. 42 U.S.C.
§ 1396d(a) (4)(B).  These services include "necessary health care, diagnostic services,
treatment and other measures . . . to correct or ameliorate… physical and mental illnesses
and conditions."  42 U.S.C. § 3396d(r).

nationally accepted standards spelled out in the "*J.K.* Principles."  As the Agreement itself

states, "The Principles for delivery of Title XIX behavioral health services …are the

foundation of this Settlement Agreement…."  *Id.* at ¶ 19.

The Notice to the Plaintiff Class, approved by Judge Roll and issued in connection

with the Fairness Hearing, described Defendants' obligations under the Agreement as

follows: "The Defendant state agencies have agreed to develop a behavioral health care

system that will provide services to eligible children according to a set of Principles

outlined in the Agreement (the 'J.K. Principles')." Exhibit I (Doc. 592-8) at 3.

Defendants have acknowledged the Agreement requires a "fundamental shift in the way

[the state] treats children and families." ADHS Press Release at 2 (Mar. 20, 2001), Exhibit

F, Plaintiffs' Pre-Hearing Memorandum (June 18, 2001) (Doc. 393).

In addition to fostering the development of a system delivering services consistent

with the Principles, Defendants committed to take specific actions to support such a

system, including: developing a training program that ensures staff have necessary

knowledge and skills, Agreement at ¶¶ 32-39; and changing the state's quality

management system so that it measures whether class members are receiving the services

consistent with and designed to achieve the Principles, *id.* at ¶ 55.  The Agreement

enjoyed broad support, including the endorsement of the American Academy of Child &

Adolescent Psychiatry and the state's Children's Action Alliance.[7]

---

[7] Letter from Clarice Kestenbaum, M.D. to Judge Roll (June 25, 2001) (Doc. 396); Letter
from Beth Rosenberg to Arizona Center for Disability Law (June 4, 2001), Exhibit N,
Plaintiffs' Pre-Hearing Memorandum Urging Approval of the Parties' Settlement
Agreement of March 20, 2001 at 20 ("Pls. Pre-Hearing Memo") (Doc. 393).

In support of the Agreement, Plaintiffs detailed the strong evidence that defendants were denying class members medically necessary behavioral health services in violation of federal Medicaid law.  Pls. Pre-Hearing Memo. at 20 (describing evidence that "Defendants fail to provide adequate behavioral health services to the Plaintiff class" and citing to the seven reviews by Dr. Ivor Groves, a former state mental health director selected by the defendants to evaluate their system, as well as other independent reviews that supported Dr. Groves' conclusion) (Doc. 393).  The Court found that "the Plaintiffs' case is strong" and that plaintiffs had demonstrated "the very real needs that are here in the District of Arizona as far as the type of care the law provides should be available and needs that are not currently being met . . . ."  Transcript of June 26, 2001 Fairness Hearing at 12 ("Fairness Hrg. Tr.") (Doc. 501).

## II.     THE PENDING DISPUTE RESOLUTION PROCESS

In November 2009, Plaintiffs invoked the Agreement's dispute resolution process for the second time (the first was in 2006), alleging non-compliance with the Agreement. Letter from Anne Ronan and Ira Burnim to Greg Honig and Logan Johnston (March 6, 2009), attached as Exhibit 11 to Plaintiffs' Motion for Enforcement of Settlement Agreement ("Ltr. Invoking Dispute Res.") (Doc. 473-2).  After the mediator concluded that the parties were "too far apart in their positions" for continued efforts to be productive, *see* Report of Mediator  Goldsmith (August 13, 2009) (Doc. 468), Plaintiffs sought judicial relief, including a second extension of the term of the Agreement.[8]

---

[8]  *See* Agreement at ¶ 68 (when mediation fails, a party may file an "appropriate motion" with the Court).  The 2006 dispute resolution process resulted in a three-year extension of the Agreement.

Plaintiffs' Motion for Enforcement of Settlement Agreement (Nov. 13, 2009) (Doc. 473).

Defendants filed a motion to dismiss and, through February 2010, the parties briefed

issues raised in the motions.[9]

At oral argument in November 2010, Judge Roll explained that he did not have

sufficient time to dedicate to a trial on issues in this case, despite the fact that it "is very

important. It deserves attention." Motions Hearing Tr. at 12 (Nov. 22, 2010) (Doc. 535).

On November 29, 2010, Judge Roll issued an Order denying the parties' pending motions

and directing the parties to again try mediation. Order, Nov. 29, 2010 (Doc. 530). The

Order put the parties "on notice that should this matter not be resolved through the

mediation process, it will be referred to a Special Master . . . ." *Id.* at ¶ 9.

Judge Roll was tragically assassinated before the parties' mediation began.

Shortly after an unsuccessful day of mediation, Defendants filed a Motion to Terminate

the Court's Jurisdiction (Doc. 540), which this Court denied in an Order dated February

27, 2012 (Tashima, J.) (Doc. 561). The Court ruled that the Agreement was "the

functional equivalent of a consent decree" that the district court had authority to interpret

and enforce. *Id.* at 5. As the Court noted, "It is well established that the district court has

the inherent authority to enforce compliance with a consent decree that it has entered," *id.,*

and to extend its term for non-compliance, *id. at* 6-7 (citing *Labor/Community Strategy*

*Ctr. v. Los Angeles County Metro. Transit Auth.*, 564 F.3d 1115, 1120-21 (9th Cir. 2009).

---

[9] *See* Defendants' Cross-Motion to Dismiss Plaintiffs' Motion or in the Alternative, to Remand for Dispute Resolution Pursuant to the Settlement Agreement (Dec. 30, 2009) ("Dfs. Cross-Mtn. to Dismiss") (Doc. 483); Plaintiffs' Reply (Feb. 2, 2010) (Doc. 493); Defendants' Reply (Feb. 26, 2010) (Doc. 499).

## III.   THE ISSUES IN DISPUTE

Plaintiffs invoked the dispute resolution by submitting a written statement of the issues in dispute.  Agreement at ¶ 59 ("Any party may initiate the dispute resolution process by submitting to all other parties a written statement of the issue in dispute."). That statement, Plaintiffs' letter of March 6, 2009, asserted that "key parts of the behavioral health service system required by the Settlement Agreement remain underdeveloped and, in some areas, there has been little forward movement until recently. In addition, in many areas of the state outside of Maricopa County, efforts to implement the Settlement Agreement began in earnest only recently."  Ltr. Invoking Dispute Res. at 1-2 (Doc. 473-2).  The letter also expressed concern about "backsliding" in Maricopa County.  *Id.* at 2.  A primary cause, Plaintiffs asserted, was that "Defendants have not yet set appropriate expectations for the RBHAs [Regional Behavioral Health Authorities]" with respect to the obligations of the Agreement.  *Id.*

Plaintiffs noted that "[u]nder the Settlement Agreement, the state must 'move as quickly as is practicable' to develop a functioning children's behavioral system" and "[o]nce that system is developed, it must be maintained.  Settlement Agreement, Par. 15." *Id.* at 2.  Plaintiffs wrote that "[a]s detailed during the 2006 dispute resolution process, Defendants did not take the required actions to make this happen.  As a compromise measure, Plaintiffs agreed in late 2006 to extend the term of the Settlement Agreement an additional three years." *Id.* at 3.  "As a result of Defendants' slow and uneven implementation, including since the 2006 compromise," Plaintiffs asserted, "serious issues" remain[ed]," which Plaintiffs summarized under six headings.  *Id.* at 3-6.  The issues listed included:

(1)  Whether Defendants had failed to meet their obligation to foster development of a behavioral health system that delivered services according to the *J.K.* Principles including by "conform[ing] all contracts, decisions, practice guidelines and other policies . . . to be consistent with and designed to achieve the Principles for class members."  *Id.* at 3.

(2) Whether Defendants had implemented the quality management system required by the Agreement.  Plaintiffs asserted, *inter alia*, that the quality management system "lacked the information required" to judge whether services were being delivered according to the Principles.  *Id*. at 3.

(3) Whether Defendants had implemented a training program that meets the specifications outlined in the Settlement Agreement.  Plaintiffs asserted that "[a] program meeting the specifications in the Settlement Agreement does not exist."  *Id.* at 6.

(4) Whether Defendants had the capacity to serve "high-needs children" according to the Principles.  Plaintiffs asserted that Defendants "lack[ed] a functioning system for identifying enrolled children who have high needs" (resulting in significant under-identification); high-needs children lacked "ready access to direct supports, home-based respite, and therapeutic foster care," which, as Defendants had acknowledged, were required to serve high-needs children according to the Principles, and that there were "[t]oo few" case managers "with low case loads," which Defendants had also acknowledged as being necessary to serve high-needs children according to the Principles. *Id*. at 4-5.

(5) Whether Defendants had met their obligations under the Settlement Agreement to deliver services according to the Principles to 18- to 21-year-olds.  Plaintiffs asserted that "[f]or the most part, these youth continue to be served by the adult behavioral health

system, not the children's system, and services are not delivered according to the *J.K.* Principles."  *Id.* at 5.

This Court referred the parties' dispute over compliance to a Special Master to "define the issues remaining for resolution of the Court."  Special Master's Report at 1 (Doc. 607); *see also* Court's Order of November 15, 2012 (Doc. 586).

In her Report, the Special Master found as a general matter that although the Agreement accorded Defendants considerable discretion, Defendants were obliged to "exercise the discretion afforded by the contract [Settlement Agreement] only in a manner consistent with the purpose of the Agreement and in a manner consistent with plaintiffs' reasonably expected benefits."  Report at 6.

The Special Master also found that Plaintiffs had properly raised three specific compliance disputes.  The first was "based on language taken directly from [¶ 16] of the Agreement," *id.* at 10, which requires Defendants to "conform all contracts, decisions, practice guidelines and policies related to the delivery of Title XIX behavioral health services to be consistent with and designed to achieve the Principles," Agreement at ¶ 16. The Report stated that "plaintiffs charge that defendants 'have not made changes to contracts, decisions, practice guidelines and other policies needed to achieve the Principles for class members.'"  Report at 10.  "To establish this allegation, plaintiffs must show that defendants exercised their discretion to make changes needed to achieve the Principles in a manner not consistent with the covenant of good faith and fair dealing." *Id.*

The second compliance dispute Plaintiffs raised involved ¶ 55 of the Agreement, which requires Defendants to "change their quality management and improvement [QM] system so that it measures whether services to class members are consistent with and

designed to achieve the Principles" and "include as an integral component, an in depth case review of a sample of individual children's cases."  Agreement at ¶ 55.  The Special Master found it "clear . . . that defendants promised to change their QM system so that it performs the required measurements.  The system, as developed and implemented by defendants, either measures whether services provided are consistent with and designed to achieve the Principles, or it does not.  The measurement process either did include an in-depth review of a sample of individual cases, or it did not.  The Agreement does not give plaintiffs authority to design or select defendants' QM system, but the Agreement does define measurable standards for evaluating defendants' performance.  If the plaintiffs establish that defendants' QM system does not fulfill the requirements of paragraph 55, then defendants have breached this obligation."  Report at 11.

The third compliance dispute involved ¶ ¶ 32-39 of the Agreement, which requires Defendants to implement a statewide training program.  "The final issue raised . . . involves defendants' alleged failure to develop a training program that meets the specifications of the Agreement."  Report at 13.  The Special Master found that Defendants promised both that "'[t]he behavioral health system will have qualified trainers in sufficient numbers to train front-line staff and supervisors'" and "to design a training program 'to provide front-line staff and supervisors sufficient knowledge and skills to enable them to plan and provide services consistent with the Principles.'"  *Id.* According to the Special Master, "[t]he covenant of good faith and fair dealing . . . requires that defendants provide trainers and training in sufficient quantity to fall within the reasonable contemplation of the parties."  *Id.* at 14.  In addition, "[w]hether the plan developed by defendants fulfills the covenant of good faith and fair dealing raises factual issues for the Court's consideration."  *Id.*

The Special Master found that Plaintiffs' allegations regarding high-needs children and 18- to 21-year-olds did not raise compliance disputes separate and distinct from the three described above. However, as the Special Master noted, "High-needs children are part of the class certified by the Court, and any promised performance that relates to the entire class also applies to these plaintiffs." *Id.* at 12. With respect to 18- to 21-year-olds, she also found, "[a]s is true of the high-needs children . . . , defendants owe these children, as part of the class, any obligations owed to the entire class." *Id.* at 13. Although the Special Master noted that Plaintiffs' allegations regarding these children were relevant to Defendants' compliance with ¶ 55 (regarding QM), she did not limit Plaintiffs from offering proof related to these populations on other issues. To the contrary, the Special Master made very clear that these children are "part of the class certified by the Court, and any promised performance that relates to the entire class also applies to these plaintiffs." *Id.* at 12.

At a June 21, 2013 status hearing, this Court scheduled a hearing on Plaintiffs' claims of non-compliance to begin November 18, 2013. The Court directed the parties to disclose their witnesses and exhibits by October 28, which the Court later extended to October 31. Based on the discussion at the June 21 hearing, Plaintiffs understood that the Court intended the parties to proceed without discovery.

Weeks after the hearing, Defendants demanded that Plaintiffs identify their experts earlier than the date the Court set and in particular, that Plaintiffs indicate whether they intended to call Linda Redman and John VanDenBerg, experts whom Plaintiffs had retained, along with Knute Rotto and Bruce Kamdradt in 2009-2010 to conduct an investigation and provide declarations for Plaintiffs. Plaintiffs took the position that the Court's order did not require earlier disclosure. On September 4, 2013, the Court directed

Plaintiffs to identify expert witnesses as soon as practicable and allow Defendants to depose them.  On October 11, Plaintiffs informed Defendants that Mr. Rotto would be their expert testifying at the hearing and his deposition was scheduled.  Plaintiffs also informed Defendants that Mr. VanDenBerg, Mr. Kamradt, and Ms. Redman were not available to testify at the hearing.

On October 25, Defendants served Plaintiffs a list of their witnesses, asserting that they did so in compliance with Rule 26.  Although each of the twelve identified witnesses would be offering testimony based on specialized knowledge, Defendants did not provide a summary of their testimony.  Defendants did not identify any witness as an expert witness, although at least one of Defendants' witnesses, Dr. Robert Friedman, was a retained expert.

On October 31, 2013, Defendants filed their witness list with the Court.  (Doc. 640).  Defendants described the topics of their witnesses' testimony as bearing on the "issues in dispute" in the case (according to Defendants: training, QM and "document modification") and the failure of Plaintiffs to "declare a dispute."  *Id.*  Defendants described Dr. Mario Hernandez and Dr. Robert Friedman as providing expert testimony concerning "training, QM, and document modification under the Settlement Agreement" but otherwise made no disclosures concerning them.  *Id.*  Defendants made no other disclosures.

IV.    **PROVISIONS OF THE AGREEMENT ON WHICH PARTIES' DISPUTE IS BASED**

> ***Defendants' Obligation to "Conform All Contracts, Decisions, Practice Guidelines and Other Policies Related to the Delivery of Title XIX Behavioral Health Services to Be Consistent with and Designed to Achieve the Principles for Class Members."***

To identify clearly the obligations that Defendants had assumed, the Agreement includes a section captioned, "Defendants' Obligations."  Agreement at 3.  Of the four numbered paragraphs, three specifically reference developing a behavioral health system that delivers services according to the Principles:

¶ 14:   Defendants agree to foster the development of a Title XIX behavioral health system that delivers services according to the Principles set forth in Section V below (hereinafter "the Principles").

¶ 15:   Defendants will move as quickly as is practicable to develop a Title XIX behavioral health system that delivers services according to the Principles. Once developed, Defendants will maintain the system in accordance with the Principles for the term of this Agreement.

¶ 16:   As quickly as practicable, Defendants will conform all contracts, decisions, practice guidelines and policies related to the delivery of Title XIX behavioral health services to be consistent with and designed to achieve the Principles.

Paragraphs 14-16 build on one another.  Each contains a somewhat different emphasis, but all three point to the same result.  In paragraph 14, Defendants "agree to foster the development" of a system that delivers services according to the Principles. Paragraph 15 speaks to the pace at which development is to occur: Defendants "will move as quickly as practicable" to develop the system and once developed, defendants will maintain the system.  Paragraph 16 reflects the reality that, to develop the system at the required pace, defendants must "[a]s quickly as practicable" "conform all contracts, decisions, practice guidelines and policies . . . to be consistent with and designed to achieve the Principles for class members."

According to the Special Master, Plaintiffs properly raised a dispute with respect to Defendants' compliance with ¶ 16.  Report at 10.  The Special Master found that the first

compliance dispute Plaintiffs raised is "based on language taken directly from [¶ 16] of the Agreement." *Id.*

Defendants have long acknowledged the obligation in Paragraph 16. For example, Defendants' first Annual *J.K.* Action Plan, developed by the same state officials who signed the Agreement, and subsequent annual plans, recite it and describe decisions with respect to it. *See*, *e.g.*, First Annual *J.K.* Action Plan at 7 (Nov. 1, 2001); *see also* Dfs. Cross-Mtn. to Dismiss at 4 ("the Defendants agreed to implement delivery of services according to "J. K. Principles"); at 18 ("What the Agreement requires is implementation of a system that delivers services according to the Principles."); Dfs. Reply (Doc. 499) at 3 ("Defendants agreed to implement the Principles and take the additional 'specific steps' set out in the Agreement in exchange for settling the underlying litigation.").

Although ¶ 16 references all the *J.K.* Principles ("decisions . . . consistent with and designed to achieve the Principles"), the Principles most relevant to Plaintiffs' claim of noncompliance are set forth in ¶¶ 21, 23, 25, and 27:

> ¶ 21: *Functional outcomes*: Behavioral health services are designed and implemented to aid children to achieve success in school, live with their families, avoid delinquency, and become stable and productive adults. Implementation of the behavioral health services plan stabilizes the child's condition and minimizes safety risks.

> ¶ 23: *Accessible services*: Children have access to a comprehensive array of behavioral health services, sufficient to ensure that they *receive the treatment they need*. Case management is provided *as needed*. Behavioral health service plans identify transportation the child and parents *need* to access behavioral health services, and how transportation assistance will be provided. Behavioral health services are adapted or *created when they are needed* but not available.

> ¶ 25: *Most appropriate setting*: Children are provided behavioral health services in their home and community to the extent possible. Behavioral health

services are provided in the most integrated setting *appropriate to the child's needs*.  When provided in a residential setting, the setting is the most integrated and most home-like setting that is appropriate to the child's needs.

¶ 27:   *Services tailored to the child and family*:  The unique strengths and *needs of children* and their families dictate the type, mix, and intensity of the behavioral health services provided.  Parents and children are encouraged and assisted to articulate their own strengths and *needs*, the goals they are seeking, and what services they think are *required to meet those needs*. [10]

(emphasis added).

### *Defendants' Obligation To Implement A Quality Management System That Measures Whether Services Are "Consistent with and Designed to Achieve the Principles."*

Paragraph 55 of the Settlement Agreement provides:

¶ 55:   Defendants shall change their quality management and improvement system so that it measures whether services to class members are consistent with and designed to achieve the Principles.  The measurement process will include as an integral component, an in depth case review of a sample of individual children's cases that includes interviews of relevant individuals in the child's life.  In changing their quality management and improvement system, Defendants will use lessons from the training program [ ] and the 300 Kids Project [ ].

Plaintiffs asserted in their letter invoking dispute resolution that Defendants had not developed a quality management and improvement system ("QM system") that "measures whether services to class members are consistent with and designed to achieve the Principles" pursuant to ¶ 55.  Ltr. Invoking Dispute Res. at 3-4 (Doc 473-2).

---

[10] *See also* Agreement at ¶ 22 (requiring teams to include "all other persons needed to develop an effective plan" and charging the team with developing a service plan based on "the child's and family's strengths and needs").

The requirement that Defendants develop a QM system that measures whether service delivery is consistent with the Principles is central to the design of the Agreement. One purpose of the QM system is to inform Defendants how well they are progressing in implementing the Agreement.  Information from the QM system is vital to Defendants' ability to conform decisions, policies, and practices "to achieve the Principles for class members," ¶ 16.

### *Defendants' Obligation to Implement a Statewide Training Program that Meets the Specifications Outlined in the Settlement Agreement*

The Agreement's provisions relating to "designing and implementing a statewide training program," ¶ 35, are particularly detailed and lengthy.  Set out at ¶¶ 32-39, they require among other things that:

> ¶ 35:   The training program will be designed to provide front-line staff and supervisors sufficient knowledge and skills to enable them to plan and provide services consistent with the Principles.

> ¶ 36:   The training program will have an "on-the-job" hands-on component for front-line staff and supervisors, in addition to a classroom component.  In the on-the-job component, trainers will coach and mentor front-line staff and supervisors in effective techniques and approaches.

> ¶ 38:   The comprehensive training plan will include . . . [t]ools to evaluate the ongoing effectiveness of the training program . . . [and] methodology for measuring core competencies for front-line staff.

> ¶ 39:   The behavioral health system will have qualified trainers in sufficient numbers to train front-line staff and supervisors.

In their letter invoking dispute resolution, Plaintiffs asserted that "[a] program meeting the specifications in the Settlement Agreement does not exist."  Ltr. Invoking Dispute Res. at 5 (Doc. 473-2).

## V.   DEFENDANTS' MOTIONS IN LIMINE LACK MERIT

As the above indicates, all three of Defendants' motions lack merit.

### A. Defendants' First Motion in Limine Regarding Issues in Dispute

Defendants' first motion seeks to preclude Plaintiffs from introducing evidence or argument that would be inconsistent with Defendants' mischaracterization of the Special Master's Report.  Plaintiffs agree that the Special Master rejected Plaintiffs' argument that Paragraph 15 required Defendants to fully develop a system of services by the end of the term of the Agreement.  Plaintiffs also agree that the Special Master found that Defendants had satisfied the obligations regarding substance abuse services set out in Paragraph 52 of the Agreement.  Plaintiffs do not intend to argue at the hearing that the Special Master did not make such findings, or to elicit testimony that any such obligations were not met.  Plaintiffs are unsure whether Defendants wish the Court to caution witnesses on the Special Master's findings before their testimony, but this strikes Plaintiffs as needless.  Presumably, the Court will understand how to weigh any witness's unsolicited remarks on such points.

It is plain, however, that the Special Master did not limit Plaintiffs' claim of noncompliance with Paragraph 16 to issues of "document modification."  (Doc. 641 at 5). The Special Master found that Plaintiffs had raised a valid claim of noncompliance with respect to Paragraph 16 of the Agreement, which requires Defendants to "conform all contracts, *decisions*, practice guidelines and *policies*[11] related to the delivery of Title XIX behavioral health services to be consistent with and designed to achieve the Principles."

---

[11] The obligation is not limited to policies reflected in "documents."

20

Agreement at ¶ 16 (emphasis added).  The Report stated that "plaintiffs charge that defendants 'have not made changes to contracts, decisions, practice guidelines and other policies needed to achieve the Principles for class members,'" Report at 10, which created an issue for trial.  The Report also made plain that in implementing Paragraph 16 Defendants were obliged to "exercise the discretion afforded by the [Agreement] only in a manner consistent with the purpose of the Agreement and in a manner consistent with plaintiffs' reasonably expected benefits."  Report at 6.

The Special Master did not find that evidence regarding services for 18- to 21-year-olds and high-needs children would be irrelevant at trial.  Instead, the Special Master said: "High-needs children are part of the class certified by the Court, and any promised performance that relates to the entire class also applies to these plaintiffs."  *Id.* at 12.  With respect to 18- to 21-year-olds, the Special Master stated: "As is true of the high-needs children . . . , defendants owe these children, as part of the class, any obligations owed to the entire class."  *Id.* at 13.  Plaintiffs understand why defendants wish desperately to exclude evidence about the approximately 40 percent of the class that are high-needs and 18- to 21-year-olds.  However, such evidence is relevant to Defendants' compliance with Paragraph 16 and the quality management and training provisions of the Agreement, as the Special Master confirmed and the evidence will show.  Additionally, evidence regarding Defendants' "decisions" and "policies" regarding "achieving the Principles" for 18- to 21-year-olds and high-needs children is relevant to the issue of Defendants' good faith, which the Special Master described as acting "consistent with the purpose of the Agreement and in a manner consistent with plaintiffs' reasonably expected benefits," Report at 6.

Accordingly, Defendants' first motion in limine should be denied.

**B.  Defendants' Second Motion in Limine Regarding Medicaid**

Defendants' second motion in limine seeks to preclude evidence or argument "that Defendants have breached the Agreement by not complying with Medicaid requirements or by not providing services that are medically necessary or that 'meet the needs' of the Plaintiffs."  (Doc. 642 at 6).  Throughout the dispute resolution process, Plaintiffs have asserted that Defendants breached *the Agreement*.  However, Medicaid law may be relevant to understanding whether Defendants complied with their obligations under the Agreement because, as Defendants acknowledge in their motion, the Agreement represents Defendants' commitment "to improve how [Medicaid services] were provided by developing a system that 'delivers services according to the Principles.'"[12]  (Doc. 642 at 4).  Moreover, the requirements of Medicaid law may be relevant to whether Defendants in good faith "made changes to contracts, decisions, practice guidelines and other policies needed to achieve the Principles for class members,"  Report at 10.  Finally, the requirements of Medicaid may be relevant to Defendants' good faith, especially if a change they failed to make was one explicitly required by Medicaid law.[13]

Defendants' motion does not acknowledge the close connection that exists between the Principles and the requirements of Medicaid law.  The Medicaid requirement that children be provided medically necessary services, 42 U.S.C. § 1396d (requiring States to

---

[12]  "Plaintiffs settled their allegations about whether Medicaid services were being provided in 2001 in exchange for the Defendants' agreement to improve how they were provided by developing a system that 'delivers services according to the Principles.'" (Doc. 642 at 4).

[13]  The Special Master was not asked to make findings and made no findings with respect to the relationship between Medicaid requirements and the Agreement or Principles.

provide Medicaid-eligible children "necessary . . . services, treatment and other measures . . . to correct or ameliorate . . . mental illnesses and conditions"), was the basis for the Plaintiffs' complaint and subsequent litigation that produced the Agreement. Judge Roll approved the Agreement because he understood that it was designed to "bring Arizona in compliance" with the demands of "what is required by [Medicaid] law." Fairness Hrg. Tr. at 14 (Doc.501).  Judge Roll stated the Agreement "reflects the very real needs that are here in the district of Arizona as far as *the type of care that law provides should be available and needs that are not currently being met.*"  *Id.* at 12 (emphasis added)*; see also id*. at 14 (describing "the counsel in this case . . . [as having] realistically apprais[ed] what is required by law and what could be done to bring Arizona in compliance with the demands for these types of services").  Implementing the Principles was the strategy the parties jointly chose to address the Medicaid violations of which Judge Roll determined there was "strong" proof, *id*. at 12.

Moreover, as Plaintiffs established at the Fairness Hearing, the Agreement's Principles are based on national standards in the field of children's mental health.  *See*, *e.g.*, Affidavit of John Scialli at ¶ 3 ("I fully support the proposed Settlement Agreement . . . as it provides the basis for a children's mental health system that provides care at a level at least equivalent to national standards.") (May 29, 2001), Ex. L to Pls. Pre-Hearing Memo.  It is unsurprising, therefore, that according to a former administrator of Arizona's Medicaid program, "the State has always viewed its obligations under J.K. as an integral part of its obligation to ensure that Medicaid-eligible children receive medically necessary

Medicaid services."[14]  Supp. Decl. of Linda Redman, Pls. Reply to Dfs. Cross-Mtn. to Dismiss, Ex. 2 at 1 (Docket No. 489-1).

Not only are Medicaid requirements relevant to this case, there is no basis for this Court banning argument or testimony "that Defendants have breached the Agreement . . . by not providing services that are medically necessary or that 'meet the needs" of the Plaintiffs."  (Doc. 642 at 6).  As shown above, it is impossible to discuss the topic of whether Defendants did what was needed "to achieve the Principles for class members" without making reference to the "needs" of the Plaintiff class.  The Principles are rife with references to children's needs.  As the State's former head of children's services has stated, the Principles can be "actualized" only by identifying and meeting children's needs.  Declaration of Frank Rider at 1, attached as Exhibit 1 (Doc.  594).  *Inter alia*, the Principles provide that:

    a.  "Children have access to . . . behavioral health services sufficient to ensure that they receive the treatment they *need*" and that behavioral health services to be "adapted or created when they are *needed* but not available,"  ¶ 23 (emphasis added),

    b.  The "strengths and *needs* of children and their families dictate the type, mix, and intensity of behavioral health services provided," ¶ 27 (emphasis added),

    c.  Case management be provided "as *needed*."  ¶ 23 (emphasis added), and

---

[14]  Plaintiffs also note that what Defendants refer to as Plaintiffs' "dubious legal theory" (Doc. 642 at 2) was later embraced by the Ninth Circuit in *Katie A. v. Los Angeles County*, 481 F.3d 1150 (9th Cir. 2007) (Tashima, J.).  On remand, the case was settled when Defendants agreed to provide the Plaintiff class with services similar to those called for by the Agreement in this case.

24

    d.  "[S]ervice plans identify and appropriately address . . . the specialized *needs* of children who are developmentally disabled . . . and the *need* for stability . . . in class members' lives." ¶ 24 (emphasis added).[15]

The obligations in the Agreement set out in ¶ 16 ("decisions" and "policies"), ¶ 55 (QM), and ¶ ¶ 32-39 (training) all explicitly reference the Principles, including Principles and others related to identifying and meeting children's needs.  Accordingly, "achieving the Principles" for class members necessarily requires attending to their needs.

Defendants' second motion in limine should be denied.

## C. Defendants' Third Motion in Limine Regarding Expert Witnesses

The Court directed Plaintiffs to disclose their expert witnesses and allow Defendants to take their depositions.  Plaintiffs did so.  On October 11, by letter, Plaintiffs disclosed Knute Rotto as their sole expert, and Mr. Rotto's deposition was scheduled for early November.  Mr. Rotto became unavailable for hearing the week of November 18th and he was not deposed.

When Plaintiffs disclosed Mr. Rotto, they also informed Defendants that they might offer relevant opinions through Brian Lensink, the long-time head of Defendants' "*J.K.* Team" at the State's Division of Behavioral Health Services.  Both Plaintiffs and Defendants deposed Mr. Lensink over three days, thoroughly exploring his opinions.

---

[15] As the evidence will show, the very purpose of "Child and Family Teams" is to enable the behavioral health system to effectively identify and meet a child's needs.  *See* Agreement at ¶ 22 (based on a common assessment of the child's strengths and needs, the team develops, monitors and adjusts the service plan).

Although Defendants have identified two expert witnesses they may call at the hearing, Defendants disclosed only that they may testify regarding "training, quality management, and document modification under the Settlement Agreement." (Doc. 640).

As the parties' course of conduct and correspondence reflects, neither side understood Fed.R.Civ.P. 26(a)(2)(C) & (D) to apply here.[16]  Additionally, the Rule by its terms does not apply where, as here, the Court sets different expectations concerning discovery and disclosure.

Moreover, Defendants never sought to compel the disclosures they now claim were required (and which they did not make themselves).

For these reasons, Defendants' third motion in limine should be denied.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' three motions in limine should be denied.

**RESPECTFULLY SUBMITTED** this 17th day of November, 2013.

s/ Emily B. Read
Emily B. Read
Ira A. Burnim
Julia M. Graff
Bazelon Center for Mental Health Law
1101 Fifteenth Street N.W., Suite 1212
Washington D.C. 20005-5002

---

[16]  For example, although all of the witnesses listed by Defendants are experts, Defendants have offered no summary of the facts or opinions that may form the basis of their testimony.

26

Anne C. Ronan
Arizona Center for Law in the Public Interest
202 East McDowell Road, Suite 153
Phoenix, Arizona  85004

Patrick Gardner
Young Minds Advocacy Project
115 Haight Street
Menlo Park, CA  94025

Edward L. Myers
Arizona Center for Disability Law
5025 E. Washington Street, Suite 202
Phoenix, AZ  85034

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2013 I electronically transmitted the attached Plaintiffs' Memorandum in Opposition to Defendants' Three Motions in Limine (Re: Issues in Dispute, Medicaid, and Expert Witnesses) to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Edward L. Myers III | emyers@azdisabilitylaw.org |
| Ira A. Burnim | irab@bazelon.org |
| Julia Graff | juliag@bazelon.org |
| Emily B. Read | emilyr@bazelon.org |
| Patrick Hall Gardner | patrick@youngmindsadvocacy.org |
| Edward Myers III | emyers@azdisabilitylaw.org |
| Kevin D. Ray | Kevin.ray@azag.gov |
| Gregory Honig | Gregory.honig@azag.gov |
| Logan Johnston | ltjohnston@live.com |

s/ Emily B. Read